HAMILTON (CHINN v.). See Case No. 2,-685.

---

## Case No. 5,978.

### HAMILTON et al. v. CUNNINGHAM.

[2 Brock. 350.] 1

Circuit Court, E. D. Virginia. June 12, 1828.

BILLS OF EXCHANGE — LIABILITY OF FACTOR TO PRINCIPAL—PRINCIPAL AND AGENT — LIABILITY OF AGENT—MEASURE OF DAMAGES — PAYMENT PROVISIONAL AND ABSOLUTE.

1. Where bills are remitted by a merchant to his factor, to be converted into available funds, and the factor mingles the property of the merchant with that of others, by selling the bills on a credit, and taking a joint note, covering other sums than that stipulated to be paid for the bills, this is in accordance with the general usage, and if the parties to the note become insolvent before it is due, the factor will not be held responsible, in consequence of the mere act of taking such joint note, for the loss sustained by his employer.

[Cited in Roosevelt v. Doherty, 129 Mass. 303.]

2. A factor sells bills of his principal to C. on a credit, and takes in payment, a note of previous date, having three months to run, drawn by A. and endorsed by B., who were in good credit at the time; the note is not endorsed by C. *Held*, that the circumstances of the note being of previous date, and not endorsed by the purchaser of the bills, are not sufficient, per se, to outweigh the fact, that the drawer and endorser were in good credit at the time of the transaction.

3. Nor was it of any consequence that the name of C., the purchaser, was not communicated by the factor to his principal, the principal not having demanded of his factor the name of the purchaser.

4. An agent does not bear the same relation to his principal, that the holder of a bill of exchange does to the drawer or endorser. The same negligence or omission which will deprive the holder of all recourse against the drawer or endorser, will not subject the agent to his principal, to the extent of the bill placed in his hands for collection.

5. The relation of principal and agent, is governed by general rules of law, founded on reason, and if the principal suffers, through the remissness or negligence of the agent, the actual loss sustained by the principal, in consequence of such misconduct, is the standard by which his damages must be measured. But the law merchant prescribes with exactness, the course to

be pursued by the holder of a bill, and has substituted a peculiar standard by which damages are to be measured for any deviation from that course. Hence, the factor to whom commercial paper is transmitted for collection, but who does not make himself a party by putting his name upon the paper, is an ordinary agent, governed by the law which regulates the relation of principal and agent generally, and is not subject to the law merchant.

[See Allen v. King, Case No. 226.]

6. Where bills of exchange are transmitted by a debtor to his creditor to be sold, and the debtor directs the creditor to credit him with the proceeds; and the creditor sells the bills, partly for cash and partly for negotiable notes, and gives the debtor credit in his books for the amount, in two distinct items, first, for the notes, and secondly, for the balance in cash; this is a mere provisional payment, and if the notes be not paid, he may recur to his original claim, unless, by his subsequent conduct, he converts the provisional into an absolute payment.

7. But a payment which is merely provisional in its inception may, by legal intendment, be converted into an absolute payment, by the subsequent conduct of the creditor; and whether this has been done or not, must depend essentially upon the circumstances of the particular case. Thus, where the debtor in Virginia, sent to his factors, a commercial house in New York, (who were also his creditors), bills of exchange, with instructions to sell them and credit him with the proceeds; and the factors and creditors sold them, partly for cash, and partly for credit, for negotiable paper having some time to run, and credited the debtor on their books with the proceeds, but, when the paper was subsequently protested for non-payment, the factors did not, as commercial usage required them to do, communicate the fact to the debtor, though they had a regular correspondence with him, and several letters passed between them after the protest; though one of the partners was afterwards in Virginia, and received a considerable payment from the debtor in person; and where the creditors, after the protest, transmitted an account of the balance due them by their debtor, not including therein the amount of the protested notes, and themselves, without consultation with the debtor, instituted suits upon the protested notes against the endorser, and prosecuted it to judgment, but did not issue execution thereon; these circumstances, taken together, converted the provisional into an absolute payment; and on a suit by the creditors against the debtor to recover the balance due, the debtor was held to be entitled to a credit for the amount due upon the protested notes.

[Cited in Jennison v. Parker. 7 Mich. 364; Merchants' & Manufacturers' Bank v. Stafford Bank, 44 Conn. 567; American Express Co. v. Parsons, 44 Ill. 318; Carroll v. Sweet, 128 N. Y. 22, 27 N. E. 763.]

This was an action on the case, brought by the plaintiffs [Hamilton, Donaldson & Co.], merchants in the city of New York, against Alexander Cunningham, of Petersburg, Virginia, to recover a large sum of money alleged to have been advanced by the plaintiffs to the defendant. The following special verdict was rendered by the jury:—"They find that the defendant did assume upon himself, in manner and form, as the plaintiffs have alleged, and they assess the plaintiffs' damages, by reason of the defendant's nonperformance of his said assumption, to the sum of $4285 90, with interest thereon from the 1st day of December, 1826, till paid, if the court shall be of opinion, upon the facts set

1 [Reported by John W. Brockenbrough, Esq.]

forth in the case stated, that the plaintiffs have a right to recover the two sums therein mentioned, of $1158 28, and $1158 29, with interest on the same; but if the court shall be of a contrary opinion, then they assess the plaintiffs' damages to $1870 13, with interest from the 1st day of December, 1826, till paid." The following is the case stated for the opinion of the court, referred to in the verdict of the jury:

In the month of January, 1825, the plaintiffs were, and ever since have been, and still are, commission-merchants of the city of New York, in the state of New York, and the defendant was, and ever since has been, and yet is, a merchant of the town of Petersburg, in Virginia, dealing chiefly in cotton and other produce of the country; and during that month, the defendant employed the plaintiffs, as his agents in New York, to sell for him there, such cotton and other country produce, upon commission, belonging to the defendant, and to collect for him there, upon commission, such bills or notes, drawn upon, or payable in, New York, belonging to the defendant; and to sell or negotiate for him there, upon commission, such bills of exchange upon foreign countries, belonging to the defendant, as the defendant should. from time to time, send or remit from Petersburg, to the plaintiffs in New York, to be by them there so sold or collected for him. The correspondence between the plaintiffs and the defendant, touching this business, and the agency of the plaintiffs for the defendant, in and about the same, continued from January, 1825, till August, 1826, during which time, parcels of cotton and other produce were sent by the defendant from Petersburg, to the plaintiffs in New York, and divers notes and bills drawn upon or payable in New York, and divers bills of exchange on foreign countries, were remitted by the defendant to the plaintiffs, to be by them sold or collected for the defendant; and in the course of these transactions, the defendant was in the habit of drawing bills on the plaintiffs from time to time, and the plaintiffs were in the habit of accepting bills drawn on them by the defendant, as well on the credit of the notes, bills, and goods so placed or to be placed in their hands by the defendant, to be collected or disposed of by them for him, as for the defendant's accommodation. For all of this business, the plaintiffs charged the defendant, and he allowed them, a commission, but in no instance a del credere commission; and it was the understanding of the parties that no del credere commission should, in any instance, be charged by the plaintiffs, or allowed by the defendant, upon the business done by them for him. The plaintiffs, on the 28th of November, 1825, were in advance to the defendant, on account of the transactions aforesaid, above the sum of $5000; and on the said 28th of November, the defendant remitted to the plaintiffs, two sterling bills,

to be by them sold on his account in New York, and the proceeds thereof to be placed to his credit; one drawn by John Walker on Evans & Trokes, of Liverpool, for £400 sterling, and the other, drawn by the defendant himself, on W. A. & G. Maxwell, of Liverpool, for £500 sterling. These bills were enclosed in a letter from the defendant to the plaintiffs in the following words and figures, to wit:

"Petersburg, November 28th, 1825. Messrs. Hamilton and Donaldson, Gentlemen—I herewith hand you an invoice and bills of lading for 30 bales per the Star: she sailed on the morning of the 25th. I hope you will be able to make a speedy sale of this parcel at your present quotations. You have also enclosed, John Walker's bill on Evans & Trokes, Liverpool, payable in London, for £400, and mine, on W. A. & G. Maxwell, Liverpool, payable in London, for £500. Proceeds to be placed to my credit. Cotton 14c. I am, gentlemen, yours, &c., Alexander Cunningham.

"N. B. Your letter of 23d, only came to hand this morning. Please forward the letter of advice to Messrs. Maxwells."

On the 1st of December, 1825, the defendant wrote another letter to the plaintiffs, in the following words and figures, to wit:

"Petersburg, December 1st, 1825. Messrs. Hamilton, Donaldson & Co., Gentlemen—I sent you, on the 28th, John Walker's bill, on Evans & Trokes, Liverpool, for £400, and mine, on W. A. & G. Maxwell, Liverpool, for £500, with invoice and B Lading for 30 bales cotton, per Star, and letter to Messrs. Maxwells. I am without any of your esteemed favours since. I have now to advise my draft on you for $2500. Please charge it to my account. Cotton has been brisker these two days past, and advanced ¼c. With respect, your most obedient servant, Alexander Cunningham."

The defendant's said letter to the plaintiffs, of the 28th November, 1825, and the said two sterling bills therein mentioned and enclosed, were received by the plaintiffs, on the 2d December following; and on the 7th of December, the plaintiffs sold the said two sterling bills, at New York for $4302 94, (net proceeds;) of which sum they received part, to wit: $1986 37, in cash; and for $1158 28, other part thereof, they took in payment a note of one Joseph Lyon, made payable to one Warren Rogers, and endorsed by the said Rogers in blank, dated the 7th September, 1825, and payable six months after date; and for $1158 29, the residue thereof, they took in payment another note of the same Joseph Lyon, payable to the same Warren Rogers, and endorsed by the said Rogers in blank, dated the 13th September 1825, and payable six months after date. But the first of the said notes of the said Lyon, endorsed by the said Rogers, was not for the said sum of $1158 28 only, but was for the sum of $1734 80; and the last of the said notes was not for the said sum of $1158 29 only, but was for the sum of

$1734 06: the way this happened was, that the plaintiffs had at the same time, sold other bills for one Thomson, and took these two notes of Lyon, endorsed by Rogers, in payment, as well of the two sums of $1158 28 and $1158 29, part of the proceeds of the defendant's said sterling bills, by them sold, as of the proceeds of the said Thomson's bills, by them sold at the same time, there being no connexion whatever between the defendant and the said Thomson, but the plaintiffs being in like manner agents for them both. The said Joseph Lyon, and the said Warren Rogers, were both in good credit at New York, at the time the plaintiffs took the two said notes of the former, endorsed by the latter, in manner aforesaid; and the said notes of the said Lyon, endorsed by the said Rogers, would have been regarded by prudent and well informed merchants of New York, as good security for the sums therein expressed. At the time the plaintiffs sold the defendant's said two sterling bills, it was usual in the course of business at New York, to sell such bills on a credit, and, indeed, impracticable in the then state of the money market there, to sell them for cash; and the time which the said two notes of the said Lyon, endorsed by the said Rogers, had to run when the plaintiffs took them in manner aforesaid, did not exceed the credit then usually given upon sales of sterling bills of exchange at New York; and the blending the proceeds of the sterling bills of the defendant, sold by the plaintiffs, with the proceeds of the bills of Thomson, sold by them at the same time, and the taking notes to secure the aggregate of the sums belonging to the defendant, and to the said Thomson, as before described, was, and is, according to the usage and course of such business at New York. The day after the plaintiffs had sold the defendant's two said sterling bills at New York, in manner aforesaid, to wit, on the 8th of December, 1825, they wrote him a letter advising him thereof, which was received by him at Petersburg, in due course of mail, and which is in the words and figures following, to wit:

"New York, December 8th, 1825. A. Cunningham, Esq.—We have none of your esteemed favours to reply to. Above we beg to hand you an account sales of your sterling bills, forwarded us on 28th ult.; net proceeds as above stated, $4302 64, viz.: at your credit 7th inst., $1386 37; due on a note of Joseph Lyon, endorsed by Warren Rogers, $1158 28, on the 10th March next; due on a note of the same, endorsed by the same, the 16th March next, 1158 29, which we hope will be satisfactory. The difficulty of disposing of bills here, induced us to take notes in payment, but in those taken, we have been particular, and think they are perfectly safe. The exchange was what private bills generally sold for yesterday. The same rate was obtained for Le Roy, Bayard & Co. only, and more of them than were sold were offered at that rate. Exchange will still get lower; the utter destruction of confidence, and the extreme scarcity of money, place many things in the very worst state; twenty-nine bales of your cotton by the Margaret Ann, have been sold at sixteen cents, agreed to sixty days; that in eight bales, at six months, adding two per cent. interest; twenty-one bales at ninety days, adding half per cent. The paper is good, it being sold to manufacturers. We wanted to close sales of all yours, but to day the article is heavy, a good deal having arrived; we shall do so, however, the first opportunity: it has just been landed. We beg your attention to further remittances, as we are much in want. We are, &c., Hamilton, Donaldson & Co."

The plaintiffs charged the defendant their usual commission of one per cent. (besides brokerage) on the sale of the defendant's two said sterling bills; and on the 7th of December, 1825, passed the whole proceeds to the defendant's credit, not absolutely, as to so much thereof as was due at a future day, but provisionally, in case they should be received when due; the entries on their books touching the same, were in these words and figures, to wit:

1825. December 7. By J. Lyon's note favour W. Rogers, received in part payment, of sterling bills, £900, as per account sales rendered.......$2334 40
Cash received for balance of said bills ........................... 2011 80

The defendant's two said sterling bills were not sold by the plaintiffs to the said Joseph Lyon and Warren Rogers, or to either of them, but were sold to some other person whose name has never been communicated by the plaintiffs to the defendant, or otherwise made known to him; and the plaintiffs' said letter to the defendant, of the 8th of December, 1825, contains all the information given by the plaintiffs to the defendant on the subject, except what may be found in the sequel of the correspondence between them, hereinafter set forth. The said two notes of Joseph Lyon, endorsed by Warren Rogers, were made and endorsed at the city of New York, in the state of New York, and were also payable there; and by the laws of the said state, were negotiable, in like manner, as inland bills of exchange; and the said two notes, before they came to maturity, were endorsed by the plaintiffs for the mere purpose of being placed in bank for collection, and were placed for collection in one of the banks of New York; were duly presented at maturity to Lyon, the maker, and payment duly demanded of him; and, payment being refused, were duly protested for non-payment; and due notice of the dishonour thereof was given to Warren Rogers, the endorser. The said notes and the protests thereof, are in the words and figures following, to wit:

"$1734 80. New York, September 7th, 1825. Six months after date, I promise to pay to the order of Mr. Warren Rogers, seventeen hundred and thirty-four dollars and eighty cents.

for value received. Joseph Lyon. (Endorsed.) Warren Rogers, Hamilton, Donaldson & Co. No. 2324. Due 10th March, 1826.

"United States of America, State of New York, to wit: On the 10th day of March, in the year of our Lord, 1826, at the request of Messrs. Hamilton, Donaldson & Co., I, Francis R. Tillon, notary public, duly admitted and sworn, dwelling in the city of New York, did present the original promissory note, (a true copy whereof is above written), to a gentleman in the office of Joseph Lyon, the maker thereof, and demanded of him payment thereof. He answered, that Mr. Lyon was not within, and that it could not be paid. Now, whereupon, I, the said notary, at the request aforesaid, did protest, and by these presents do publicly and solemnly protest, as well against the maker and indorser of the said promissory note, as against all others whom it doth or may concern, for exchange, re-exchange, and all costs, damages, and interest already incurred, and to be hereafter incurred, for want of payment of the said promissory note. Thus done and protested in the city of New York, aforesaid, in the presence of John Doe and Richard Roe, witnesses. In testimonium veritatis. F. R. Tillon, Notary Public.

"1826. March 10th. I this day demanded payment of within as within. William Cadle.

"1826. March 11th. I this day gave a notice to a clerk in the office of Warren Rogers. William Cadle."

The second note for $1734 06, dated 13th September, 1825, payable six months after date, and falling due on the 16th March, 1826, drawn by Joseph Lyon, and endorsed by Warren Rogers, was protested in like manner with the above. The plaintiffs did not give any notice to the defendant, of the dishonour of the two said notes of Lyon, endorsed by Rogers, until the 30th of June, 1826, when they wrote him a letter of that date, giving him the first information he had received of the dishonour of the said two notes. This letter was received by the defendant in due course of mail, and is in the words and figures following, to wit:

"New York, June 30th, 1826. A. Cunningham, Esq. We wrote you on 21st inst., and are since without any of your favours. As there is upwards of $11,000, what we are still in advance of you, it becomes necessary we should have remittances to the amount thereof, or we can draw on you. Be pleased to let us know what you would prefer: It is only important we should have one way or another, and if an accommodation of $7000, or $8000, of that amount can be of service to you, we have no objections to accommodate you, under the understanding, that your drafts will be punctually met. The notes of Joseph Lyon, endorsed by Warren Rogers, for part of what your bill on W. A. & G. Maxwell for £500, and John Walker's on Evans & Trokes for £400, were sold in part, as you will see by account sales rendered you, and by our letter of 8th December, remain unpaid. Aware of your distress, arising from other losses, and being in weekly expectation that Mr. Rogers, who has ever been considered good, would arrange the payment of them, since they became due, were the causes of our not writing you earlier on the subject, but he waives the payment of them so long, that we deem it necessary to advise you of the state of things. The notes have been regularly protested, so as to bind Mr. Rogers, and we still think he is able to pay. Your advice on the subject, however, is desirable, although we have hitherto left nothing undone to bring about payment in that way we thought best. Another house, whose bill we sold, is implicated with you in this transaction. It is unnecessary to state to you our feelings on this communication; they are painful in the extreme, knowing as we do, how you have already suffered; but we do hope that you will suffer but little, if any, by this. Mr. Rogers has promised to do something soon, and we hope it will be satisfactory to all. He is certainly sufficiently able, and has always before this, stood high for punctuality, and as a man of wealth, and in his own affairs, he is perfectly unembarrassed. We are, &c., Hamilton, Donaldson & Co."

Before the said two notes were dishonoured, to wit: on the 13th of January, 1826, the plaintiffs wrote a letter to the defendant of that date, and endorsed him his account current, to the 1st of January, 1826, containing therein, the credits, as above stated, for the proceeds of sale of the defendant's said two sterling bills, and the debit for commission thereon, and showing a balance against the defendant of $3306 66. This letter, and the account current enclosed, were received by the defendant at Petersburg, in due course of mail, which letter is in the words and figures following, to wit:

"New York, January 13th, 1826. A. Cunningham, Esq. Annexed, we beg leave to hand you account sales of your thirty bales cotton, per the Margaret Ann. Net proceeds, $1464 42, at your credit, due 29th March next; also of your thirty bales, per the Star, net proceeds, $1430 60, at your credit, due the 25th of February next; likewise, your account current with us, up to the 1st inst., showing a balance in our favour of $3296 38, at that time, all of which we hope you will find correct. We closed the accounts of Messrs. A. & R. M. Cunningham in our books, the balance due on which, you will perceive you are charged with. The most part of the cotton sold, is at 13, some little at 13½, and some at 12½@12¾.

"P. S. We enclose for your acceptance, Mark Wilson, Esq's. draft on you, at 3 months, for $2000, which be pleased to return. Yours, &c., Hamilton, Donaldson & Co."

After the said notes had been dishonoured, to wit, on the 21st of April, 1826, James Hamilton, one of the plaintiffs, was in the town of Petersburg, and there received from the defendant in person, on account of the

dealings between the plaintiffs and the defendant, $3000 in bank notes, and a draft for $2000, and gave the defendant a receipt for the same, in the following words and figures, to wit:

"Received, Petersburg, 21st April, 1826, of Alexander Cunningham, Esq., three thousand dollars in the Bank of Virginia notes, and a draft of Beers, Bunnell & Booth, on Beers & Bunnell, of New York, dated 20th April, 1826, at 60 days date, for three thousand dollars, which are to be applied to his credit, with Hamilton, Donaldson & Co., on my arrival in New York. James Hamilton."

Afterwards, to wit, on the 5th of May, 1826, the plaintiffs wrote a letter from New York, to the defendant of that date, wherein they say, among other things:—"Your drafts on us in favour of Mr. M'Cauley, becomes due the 19th inst., all of which, with the balance due on former account, amounts to $8195 99." The "former account," in the passage alluded to, was the same account current rendered by the plaintiffs to the defendant, hereinbefore referred to; and the said balance of $8195 99, is made by assuming the balance of $3306 66, appearing due on that account current, as a correct balance, adding thereto the said drafts in favour of M'Cauley, amounting to $5050, and the sum of $2000, and crediting the defendant by an item of $2160 67, for money received in March, 1826. And nothing was included in the said sum of $8195 99, as charged to the defendant on account of the said two protested notes of Lyon, endorsed by Rogers. On the 22d of July, 1826, the plaintiffs wrote a letter to the defendant of that date, and therein enclosed an account current, brought down to the 1st of August following, in which the defendant is charged under dates of the 10th and 16th of March, 1826, with the aforesaid two sums of $1158 28, and $1158 29, on account of the two protested notes of Lyon, endorsed by Rogers, which letter and account current were received by the defendant in due course of mail. In November, 1826, the plaintiffs rendered the defendant another account current, carried down to the 1st of December following, showing that a balance would be due to the plaintiffs, at the last mentioned date, of $4756 11, in which balance are included the two sums aforesaid, of $1158 28 and $1158 29, charged in the account rendered in July, 1826, (before referred to) under dates of the 10th and 16th of March, 1826, on account of the said two protested notes of Lyon, endorsed by Rogers. In December, 1826, an application was made to the defendant, through an agent of the plaintiffs' at Petersburg, to settle the account, and to pay or secure the balance due the plaintiffs thereon; when the defendant, (besides objecting to some other items of charge against him in the said accounts, which are not now in controversy,) objected to the said two charges against

him, under dates the 10th and 16th of March, 1826, of $1158 28, and $1158 29, on account of the said two protested notes of Lyon, endorsed by Rogers, which two items (principal and interest,) are the only points now here in controversy: the plaintiffs insisting that the defendant is bound to pay them those two sums, with interest from the dates at which they are charged; and. the defendant insisting that he is not bound to pay the plaintiffs the said two sums, or either or any part thereof, principal or interest.

(Here follows, .in the agreed case, the whole correspondence between the plaintiffs and the defendant, from the origin of the transaction, which is the subject of the present controversy, until the dealings between them wholly ceased. That correspondence is very voluminous, embracing a period of more than a year, and the editor has deemed it proper to omit it; the more especially, since the portion of it which particularly applies to the two notes of Lyon, endorsed by Rogers, which constitute the subject matter of this suit, has been already incorporated in the agreed case, as above set forth.)

The plaintiffs, as endorsers of the said Warren Rogers, instituted an action at law against the said Rogers, on the beforementioned two notes of Joseph Lyon, endorsed by the said Rogers, in the supreme court of judicature, of the people of the state of New York, which action was brought to the term next ensuing the date of the protest of the said two notes, and they thereon recovered judgment against the said Rogers, in the month of May, 1827. No process of execution has been sued out by the plaintiffs, on the judgment obtained against Rogers.

MARSHALL, Circuit Justice. Before I proceed to the point on which this cause appears to me to depend, it may be proper to notice some incidental questions which have been suggested in its progress, or in the argument on the case agreed.

It was contended by the defendant, at the trial before the jury, that the plaintiffs, by mingling the property of the defendant, with that of others, in a joint note, so as to deprive him of that perfect control over it, which his interest might require, or at least to embarrass the exercise of that control, had so misconducted themselves in their agency, as to become liable for the debt. I was inclined to this opinion, but placed it upon the usage at New York. The case states that usage, so as to justify the conduct of the agency, and this is no longer a question in the cause; but I think it proper to declare, that I satisfied myself, as soon as I looked into the subject, that my first impression was an erroneous one, and that the usage of New York, conforms to the general rule. 1 Liverm. Ag. 85. He quotes Mal. Lex Merc. 81, 82; Moll. de J. Mar. bk. 3, c. 8, § 4; [Ingraham v. Gibbs] 2 Dall. [2 U. S.] 136, note page 134; [Schenkhouse

v. Gibbs] 4 Dall. [4 U. S.] 136; Beawes, in his Lex Mercatoria (6th Dublin Ed. p. 36) in his chapter on the Law of Factors, &c., says: "One and the same factor may, and, generally, does act for several merchants, who must run the joint risk of his actions, though they are mere strangers to one another; as if five merchants shall remit to one factor, five distinct bales of goods, and the factor make a joint sale of them to one man, who is to pay one moiety down, and the other at six months' end; if the buyer breaks before the second payment, each man must bear a proportional share of the loss, and be contented to accept of their dividend of the money advanced." That the bills were sold upon credit, has not been urged against the agents as misconduct, because they gave notice thereof to their principal, who acquiesced in the sale. Independent of this fact, the sale upon credit was necessary and usual at the time, and was within the power to sell. But the defendant insists on the fact, that his agents received notes in payment for the bills, which notes had been given some time before, and were not endorsed by the purchasers of the bills. These circumstances are said to be such as cast suspicion on the notes, and ought to have restrained the agent from taking them. What influence these circumstances, connected with others, might have on a jury, it is not for me to say. They are presented to the court, in the case agreed by the parties, connected with no other circumstance than this: that the makers of the note were, at the time, considered as good. If A. and B. give their note to C. on account of any transaction with him, and before it becomes payable, C. wishes to negotiate it, I have never understood that, in a commercial city, this is an unusual circumstance which ought to discredit the note. If I am correct in this, I can perceive no distinction between taking the note having three months to run, and taking the note of C. the purchaser, with D. as his surety on the same credit. The whole depends on the relative credit of the parties. If A. and B. are as trustworthy at the time, as C. and D., I can perceive no solid reason for distinguishing between their notes. The same reasoning excuses the agent for not insisting on the endorsement of the purchaser. A man may be unwilling to put his name on any paper, and this might render doubtful notes still more doubtful; but ought not, I think, to discredit the notes of men whose mercantile standing was solid at the time. The circumstances, that the bills were sold for a note of previous date, on which the purchaser did not place his name, are not, I think, per se, sufficient to weigh down the fact, that the maker and endorser were, at the time, in good credit.

Some stress has been laid on the fact, that the name of the purchaser has not been communicated to the defendant. But the purchaser was not responsible, and the agent could have no motive for communicating it. Had it been demanded, suspicion might have been justified by withholding it; but no importance ought, I think, to be attached to the simple omission to communicate it, when no inquiries were made on the subject.

A point of more difficulty has been very much pressed in the argument. It is the omission of the agent to give notice of the non-payment of the notes. It is laid down generally by Paley and Chitty, that it is the duty of an agent in whose hands a bill is placed for collection, to give immediate notice of its dishonour. Both Paley and Chitty adopt the rule from Beawes' Lex Mercatoria, in his chapter on Bills of Exchange, &c., fig. 117 (6th Dublin Ed. 373). The passage in Beawes is in the following words: "It is incumbent on him to whom a bill is remitted in commission; 1, to endeavour to procure acceptance: 2, on refusal, to protest, (if not forbidden,) though not expressly ordered: 3, to advise the remitter of the receipt, acceptance, or protesting it, and, in case of the latter, to send the protest to him: 4, to advise any third person, that is or may be concerned in it, and all this by the post's return, without further delay." The counsel for the defendant insists, that a neglect of the duty thus prescribed, renders the agent liable for the amount of the bill, if the debt should be lost. The plaintiffs contend, that such neglect subjects him only to compensation for the injury actually sustained from that cause. It is plain, from the language of the sentence, that the author could not mean to say, that the failure of the agent in any part of the duty thus prescribed, would subject him, under all circumstances, to the payment of the whole bill, if it should be dishonoured by non-payment on the part of the drawee. It is declared to be equally the duty of the agent to advise the remitter, of the receipt, acceptance, or protest. These are placed in the text on the same footing. But it will not be pretended that the omission to give notice of the receipt of the bill, or of its acceptance, would render the agent liable for its amount, on the failure of the acceptor to pay.

The defendant's counsel, however, do not put the case so strongly as to insist, that the agent, by neglecting any particular part of his duty, becomes responsible for the whole debt, should the acceptor fail. They contend that he is in the same situation as the holder of a bill, or as if he had been a party to the note, and incurs the same responsibility, for any neglect of duty, as such person would have incurred. The plaintiffs controvert this proposition. The general rule, appears to me to be, that a person acting on commission, who by his misconduct has brought loss upon his principal, is responsible to the precise extent of the loss produced by that misconduct. The rule is very well expressed by Mr. Livermore, in his valuable treatise on Agency (volume 1, p. 398). He says: "The

loss which the principal has sustained by reason of the negligence of his agent, I should take to be the true measure of damages, in an action founded upon that negligence. This appears to follow from the very definition of damages, being a recompense given by the jury, for the injury or wrong done to the party." And Beawes, in his chapter on Factors, &c., says: "A factor is but a servant to the merchant, and receives from him, in lieu of wages, a commission," &c. "He ought to keep strictly to the tenor of his orders, as a deviation from them, even in the most minute particular, exposes him to make ample satisfaction for any loss that may accrue from his non-observance of them." Again he says: "A factor should always be punctual in the advises of his transactions in sales, purchases, affreightments, and, more especially, in draughts by exchange; for if he sells goods on trust, without giving advice thereof, and the buyer breaks, he is liable to trouble for his neglect; and if he draws without advising his having done so, he may justly expect to have his bill returned protested." The rule which governs human transactions generally, is, that compensation shall be apportioned to the injury; and that rule is, I think, applicable to principal and agent. Russel v. Palmer, 2 Wils. 325; Smedes'. Ex'rs v. Elmendorf, 3 Johns. 185. To this general rule, there are some exceptions. The law merchant has made one, which stands on reasons peculiar to itself. This exception relates to commercial paper. For the benefit of trade, and to avoid endless contention respecting liabilities, on paper of that description, a set of positive rules, prescribing with precision, the exact course to be pursued by the holder, and measuring the damage in every case of deviation, has been substituted by merchants, instead of the general rule of law, that the person chargeable with negligence, shall be responsible for the damages actually produced by his misconduct. This exception, applies to all those whose names are on the paper, and to a person who has induced an endorser to take a bill by a written promise to accept, but has not, I think, been carried farther. I do not think it has been extended to an agent to whom commercial paper is transmitted for collection, but who does not make himself a party to that paper, by putting his name upon it. I find no case which establishes this principle.

Beawes, in his chapter on Bills of Exchange, &c., fig. 18, says: "When any person has bills sent him to procure an acceptance, with directions to return them or hold them at the order of the seconds, &c., and the person to whom they are sent, either forgets or neglects to demand acceptance, or if he suffers the party on whom they are drawn to delay their acceptance, and the drawer, in the interim, fail, he is certainly very blame-worthy, for his carelessness and disregard of complying with his obligation; though this will not subject him to payment of their value." Mr. Beawes adds: "But if he should be urged and pressed to procure acceptance and payment of a bill sent him, and should protract or defer the getting it done, and the acceptant, being ignorant of the drawer's circumstances, declares he would have accepted it, had it been timely presented; the person guilty of the neglect will be obliged to make good the loss that has happened to his correspondent, purely through his omission and carelessness." Both these cases show, very clearly, the distinction supposed by Mr. Beawes to exist, between an agent to whom a bill is remitted for collection, and an endorser. If the liability of an agent to his principal was the same with that of a holder to his endorser, there can be no doubt that the loss would be his in the first case put; and that it would be equally his, in the last case put, although the drawee should not declare "that he would have accepted it, had it been timely presented." The same author, in the same chapter, fig. 97, says:—"If a remitter in commission stands del credere for the remisses, he acts indiscreetly, if he has the bills made payable to himself or order, that he may endorse them." Among other reasons for this opinion, one is: 2, that, "the remitter by this means, makes himself liable, not only to answer all damages, &c., to his principal, but also to every possessor and endorser of the bill after him." "3. By endorsing the bill, he makes it his own, and obliges himself on the account of his principal, not only for the value by him received, but for all other charges and re-exchanges." "And though a remitter by commission does not stand del credere, he acts with equal imprudence in having the bills made payable to himself or order, and then endorses them, for thereby, he effectually engages himself to stand del credere, without reaping any advantage therefrom." These passages show, that Mr. Beawes takes a clear distinction, between the relation in which an agent for collection stands to his principal, and that in which the holder of a bill stands to the drawer or endorser. The same negligence or omission which will deprive the holder of all recourse against the drawer or endorser, will not subject the agent to his principal to the extent of the bill placed in his hands for collection. His name is not on the bill, and the law merchant does not apply to him. Warrington v. Furbor, 8 East, 242. The case of Bridges v. Berry, 3 Taunt. 130, was a bill drawn by the defendant himself. The decision, that the neglect of the holder to give notice to the drawer of its dishonour, deprived the holder of his recourse against the drawer for a pre-existing debt, as a security for which this bill was given, belongs to a different and a much more difficult question, which I am about to examine.

The main question in the cause, and I will not affect to consider it a clear one, is this. Have the plaintiffs, by their conduct respecting these notes, made them absolute payment

towards the discharge of the debt due to them from the defendant? Have they made the notes their own? The parties stood towards each other in the double relation of principal and agent, and of debtor and creditor. This double relation does not sink either character, nor lessen the obligations imposed by either. That these notes were not applied in part payment of a pre-existing, ascertained, and fixed debt, but to the credit of the defendant in a running account, in which he was uniformly the debtor, is not, I think, a material circumstance. The transaction was not a sale of the bills of exchange, or of the notes, by the defendant to the plaintiffs; but an application of those bills, and of the notes for which they were sold, to his credit with them, in the ordinary way in which such paper is credited; that is, provisionally, to become absolute in their payment, or on such other event as may authorize the debtor to consider them as paid. It is admitted to be incumbent on the person receiving negotiable paper under these circumstances, to use due diligence to obtain its acceptance and payment; and that neglect in these respects, converts the provisional into an absolute payment. But due diligence, it is alleged, has been used in this case; and the charge against the agents and creditors is, that they did not give notice that the notes were dishonoured. Mr. Chitty (page 126) says: "The effect of taking a bill of exchange or promissory note, in satisfaction of a precedent debt, is, that the creditor cannot proceed in an action for such debt without showing that he has used due diligence to obtain acceptance or payment; and also showing, if the defendant was a party thereto, or delivered it to the plaintiff, that the defendant had due notice of the dishonour."

Elementary writers sometimes state general rules as if they were universal; and do not always make those discriminations which a comparison of the cases themselves shows ought to be made; nor trace results to the true principle which produces them. Chitty is, undoubtedly, a very respectable writer; but when he carries a rule farther than the cases have carried it, the proposition he states, rests upon his own authority entirely; and when the dictum stands alone, unaccompanied by the principle on which it is founded, there is the more reason for searching out the principle, and inquiring whether that will comprehend the case which the dictum will comprehend. If it will not, we may conclude that the writer has expressed himself carelessly, and may withhold our assent from his proposition, in the broad terms in which he states it. In this case, Mr. Chitty makes it indispensable, that the defendant should have due notice of the dishonour of a note given, provisionally, in payment of a debt. In general, the person who delivers such note, has his recourse against some other person, and that recourse may be lost, if immediate measures be not

taken to enforce the claim. In any case, there is an actual loss, or the law supposes a loss of the debt, and throws the hazard on him whose negligence has produced it. Mr. Chitty lays down the rule as if it did not depend on the fact, that there were other persons whose responsibility might be affected by the want of notice. The authorities on which he relies for this broad proposition, are, an act of parliament passed in the fourth year of the reign of Queen Anne, and Bridges v. Berry, 3 Taunt. 130. The act of parliament is not supposed to affect this case. It may, however, be proper to advert to it. It enacts that "if any person accept any bill, for and in satisfaction of, any former debt, &c., the same shall be esteemed a complete payment of such debt, if the person do not take his due course to obtain payment thereof," &c. Mr. Chitty may have founded himself on his construction of this statute: so far as he has done so, his authority is inapplicable to this case.

Bridges v. Berry was an action brought against the acceptor of a bill of exchange, who, when the bill fell due, obtained time and gave the holder a bill drawn and endorsed by himself on one Ivory, payable two months after date. This bill was dishonoured, and the plaintiff omitted to give notice of its non-payment to the drawer. At the trial, it was admitted, that the plaintiff could not recover upon it, but he insisted that it constituted no bar to a recovery of the original debt. The court determined that it was a bar; and if no reason had been given for the opinion, I should admit that the case supported the principle for which it is cited. But the court does give a reason; it is that the defendant himself had a right to sue other persons, and that the plaintiff, by not giving him due notice of its dishonour, had put it out of his power to recover what was due thereupon. This is not an argument mixed up with other arguments, conducing to the judgment of the court, but is the very principle of that judgment. It is the distinction taken in that case, and one cited in argument. It is the very foundation of the judgment, a fact, without which, the judgment would not have been rendered. I will take the liberty to say, that this decision, if not inconsiderately made, has been very carelessly reported. The defendant was the drawer and endorser of the bill, which was dishonoured. His recourse upon it, therefore, could have been only against the acceptor. His right to recover against the acceptor, depended on having funds in his hands, and the ability to recover, could be lost only by the insolvency of the acceptor. Neither of these essential facts is stated in the report, but the opinion of the court is founded on them, and in applying the case, we must suppose their existence. Here, then, is an actual loss sustained by the debtor, to the amount of the bill, and his exoneration from the original debt, is made to depend on that loss. The case,

therefore, does not support the broad principle which Mr. Chitty has extracted from it. I cannot forbear noticing the distinction taken between the right to recover on the bill which had been dishonoured, and on the original debt. It was admitted that no suit could be sustained on the dishonoured bill. Why? Because the law merchant applied to it, and the doctrine of notice discharged the drawer and endorser. If this necessarily applied to the debt, on account of which the bill was given, then there could be as little question in a suit for that debt, as on the bill. The law merchant would settle one case as positively as the other; but while the claim on the bill was abandoned as desperate, that for the original debt was defeated, only by the consideration of actual loss sustained, in consequence of the negligence of the creditor who was the holder of the bill. This distinction is still more strongly marked in Bishop v. Rowe and Bishop v. Bayly, 3 Maule & S. 362. The suit against Rowe, was on a bill of exchange, drawn and endorsed by himself, and accepted by J. Bayly. It was also endorsed by the plaintiff, and was discounted at bank for Tucker. The bill was dishonoured, and due notice given. The money was in part paid, and, for the residue, amounting to £100, Tucker drew a bill on Lewis, payable to the plaintiff, which the plaintiff endorsed, and carried to the bank. This bill was also dishonoured, but no notice given to Tucker. It was insisted that, because the remedy on the substituted bill was lost, no action could be maintained on the original debt. A verdict was taken for the plaintiff, and a rule to show cause why a new trial should not be granted, was discharged. Lord Ellenborough laid some stress on the circumstance, that the name of Tucker, though the person for whom the original bill was discounted, and who was, consequently, the debtor in fact, was not on it. Tucker was, therefore, a person intervening, and his bill was accepted, not for, and in satisfaction of a former debt, under the statute of Anne, but for the chance of its being productive. The plaintiff might have returned it presently, or within a reasonable time; and when the bill is dishonoured, unless it had been received in satisfaction of a former debt, he was not bound to go farther. Lord Ellenborough expressed great doubt, but was finally of opinion, that the original creditor was not bound to prove that notice was given to the drawer of the substituted bill, especially where the name of that drawer was not on the bill which constituted the original debt, for which the suit was brought. Le Blanc, J., was of opinion that no action could have been maintained on the substituted bill, for want of notice; but that the substituted bill was no payment of the original bill, unless something had been done to discharge the party to that bill. If he could have shown that by the laches of the plaintiff in the course of this negotiation, he had lost £100, or that he had been prevented from suing on the £100 bill, he might have made out a defence. Bayley, Jr., was of opinion, that if the defendant had proved that Tucker drew on funds in the hands of the drawee, the defence might have been sustained, but not having shown this fact, he had not made out his defence. This was, undoubtedly, a case in which the inclination of the court might be excusably in favour of the plaintiff, for justice was plainly and strongly with him. The principle, in this case, as in Bridges v. Berry, is, that if a bill be received as provisional payment, the omission to give due notice of its dishonour, deprives the creditor of his action on that bill, but does not compel him to take it as absolute payment, or deprive him of his action on the original debt, farther than damage has been sustained, actually, or in legal supposition, by the debtor. In both cases, the possible damage, was the loss of the funds which the drawer might have in the hands of the drawee. The court of common pleas seems to have assumed the existence of such funds; the court of king's bench required proof of the fact. They both show how entirely the question, whether a provisional, becomes an absolute payment, depends on circumstances, and how carefully all those circumstances are to be considered. Both these cases turn singly on the omission to give notice, unaccompanied with any positive act, on the part of the creditor; circumstances may undoubtedly raise a legal presumption against the person who is creditor, or agent, or both, which may charge him with the loss, if he is merely an agent, or convert a provisional, into an absolute payment, if he is a creditor. Some strong cases of this description have been cited, which, though decisions at nisi prius, are not to be absolutely disregarded.

In Edgar v. Bumstead, 1 Camp. 411, the plaintiff, an insurance broker, had paid money assured for an insolvent underwriter, not knowing his insolvency at the time. Lord Ellenborough was of opinion that it could not be recovered back. This opinion was placed on the known course of dealing between the insurance broker, the merchant, and the underwriter. The agent, if not acting del credere, would certainly not have been liable for the insolvency of the underwriter, yet, the act of voluntary payment, though made by mistake, fixed the debt due from the underwriter on him, and made it his own.

In Jameson v. Swainstone, 2 Camp. 546,[2] the plaintiffs, who were insurance brokers, had effected a policy for the defendant on a vessel, which was afterwards stranded, and the plaintiffs advanced considerable sums of money to refit her for the voyage. An average loss was adjusted in May, 1806, upon which the plaintiffs transmitted an account to the defendant, debiting him with their advances, and giving him credit for the average loss

---

[2] Reported in a note to Bousfield v. Creswell, 2 Camp. 545.

due from the underwriters. The balance due on this account was immediately paid. In the month of August following, which was the usual time of settling between the brokers and the underwriters, the plaintiffs called upon the underwriters, some of whom refused to pay, on the ground of insolvency. Different applications were afterwards made, but without success. In August, 1808, the plaintiffs transmitted another account to the defendant, claiming the sum due from the insolvent underwriters; on their refusal to pay, a suit was instituted, and at the trial, Mansfield, C. J., said, he was of opinion, that after so great a lapse of time between rendering the two accounts, the brokers, as between themselves and their principal, must be presumed either to have received actual payment from the underwriters, or to have settled with them some other way. For the purpose of recovering from the defendant, they should have apprized him in August, 1806, of the state of the underwriters, who, he was naturally led to suppose, had settled with the brokers; and their silence had deprived him, for the space of two years, of all opportunities of enforcing the policies of insurance. The verdict was for the defendant. This is a case of simple agency. The delay will be admitted to have been such as to justify the opinion of the assured, that the money had been received by the brokers. But the language of the judge shows clearly, that immediate notice of the failure of the underwriters ought to have been given, and we are left to conjecture, for what length of time the laches of the agent might have been excused.

These cases, as well as those of Andrew v. Robinson, 3 Camp. 199, and Ovington v. Bell, Id. 237, show on what nice circumstances these questions turn.

In the case under consideration, a bill of exchange was remitted to the plaintiffs by the defendant, who was a debtor to the plaintiffs, in a letter of the 25th of November, 1825, directing them to sell it, and to place the proceeds to his credit, with them. This bill was sold on the 7th of December, partly for cash and partly for negotiable notes, payable in March, 1826, which were endorsed to the plaintiffs, and placed by them in bank for collection. Notice of the sale was given to the defendant the succeeding day, and an account transmitted to him on the 13th of January, 1826, in which he was credited for the proceeds of the bill. The money and the notes constituted two distinct items of credit. Thus far, the conduct of the agents was unexceptionable. The bill was transmitted to them to be converted into available funds, and if they sold it upon credit, the notes might have been payable to the defendant, in which case, they must have been transmitted to him to be endorsed, and returned for collection, or might be made immediately payable to themselves. The latter course was more convenient to the parties,

but it subjected the agents, however correct in itself, to any disadvantage connected with it. In March, 1826, the notes were regularly protested for non-payment. According to commercial usage, the plaintiffs ought to have given the defendant immediate notice of their dishonour, and thus have put it in his power to direct such measures, as his view of circumstances might suggest. Bayley, Bills, 174. No doubt he would have been guided by the advice of the plaintiffs; but he had a right to the exercise of his judgment, and the plaintiffs ought to have enabled him to exercise it.[3] The correspondence between the parties was regular and frequent, yet no hint was given of the non-payment of these notes, until the 13th of June, 1826. From the silence of the plaintiffs respecting these notes, through the whole of this correspondence, the defendant had certainly a right to presume that they were paid, and had undoubtedly a claim upon the plaintiffs, commensurate with their actual damages. The rule by which these damages would be ascertained, is not now the question. The defendant insists, that the payment has become absolute, without entering upon this inquiry. If the case stopped at this point, I believe my opinion would be against him. But it does not stop at this point.

It is unnecessary to discuss the intricate questions which would arise in this stage of

[3] Opinion of Parsons, C. J., in Colt v. Noble, 5 Mass. 167: "A person appointed a factor to cause a bill to be presented, is intrusted with no other powers, and it is his duty to notify his principal. The factor may not know to which of the prior parties to the bill the principal intends to resort, and if he does, he may not know their domicils, as he has no interest in the bill or privity with the parties." The contest in that case was between the holders and the endorser. After the plaintiffs had purchased the bill of the defendant, then master of an American ship at Madras, and bound to Portsmouth, in New Hampshire, where his domicil was, they seasonably sent it to their agents, merchants in London to obtain payment of the drawers there. The agents in due time caused the bill to be protested for non-acceptance and non-payment, and in a reasonable time, returned the bill with the protest to the plaintiffs in Madras. The agents sent no notice to the domicil of the defendant, which they might have done in three months from the protests, but due notice was given by the plaintiffs from Madras. The question was, whether the agents of the holders in Madras were bound to give notice, &c. to the defendant, the endorser, or only to return the bills with the protests to their principals, who were seasonably to give notice? In the course of his opinion, Parsons, C. J., said: "It is admitted by the defendant's counsel, that if a bill be remitted in payment, the correspondent may return it to the principal, when dishonoured, and is not bound to give notice to any of the prior parties to the bill. This is true; but the reason is, that he considers himself a mere factor, until the bill be honoured. Then, as holder, he receives the money to his own use, crediting the principal with the payment. There is, therefore, no differnce between the cases of a bill sent to a factor to procure acceptance, and of a bill remitted to a correspondent in payment, if the bill be dishonoured." Judgment for the plaintiffs.

the cause, the notes being negotiable paper; because, my opinion turns chiefly on the acts of commission on the part of the plaintiffs, taken in connexion with this act of omission, and with another which will be hereafter noticed. On the 21st of April, 1826, James Hamilton visited the defendant in Petersburg, and received from him a very considerable payment on account of the debt to them, without mentioning the non-payment of the notes. This fact is a strong circumstance to show, that the plaintiffs relied on the notes. It is said not to be shown, that Hamilton was the partner who transacted the business, or that he was acquainted with the fact. This might be an important inquiry in a criminal prosecution; but in a civil action, brought by the firm of Hamilton, Donaldson & Co., all the partners, as residents of New York, must, I think, be presumed, unless the contrary be shown, to be residents, to be active partners, and to be acquainted with the whole transaction. The silence of Mr. Hamilton is the silence of the firm.

A still more important fact remains to be considered. On the 5th of May, 1826, the plaintiffs wrote a letter to the defendant, concerning their increased responsibility for him, in which they recognise the account transmitted in January, and re-state the balance between them, upon the principle that the notes were paid. This is, I think, equivalent to an account in which unconditional credit should be given for the notes. They were then dishonoured. The plaintiffs gave no notice of their dishonour, but credit the defendant for them. Had the relation between the parties been merely that of principal and agent, and the plaintiffs, instead of crediting the defendant for the notes, had paid their amount, the case would have been much stronger than that of Edgar v. Bumstead, because the money would have been paid, not through mistake, but with full knowledge of the insolvency of the parties to the notes. Between the payment of the money by a mere agent, and the transmission of what is equivalent to an acknowledgment of the payment of the notes, by a person who is at the same time agent and debtor, the distinction, I think, cannot easily be drawn. I have said that there is still another act of omission which has considerable influence on this case. That is, the failure to enforce the judgment which has been obtained, or to show, otherwise, the insolvency of those who are liable for them. I readily admit, that in general, it is sufficient for him who has received negotiable paper as a provisional payment, to present it for acceptance, and to demand payment, and in the event of the bill's being dishonoured, he may return it, and recur to his original claim. Had these notes stood in the name of the defendant, this course would have been sufficient. But they are in the name of the plaintiffs, and have been put in suit in their name. If the notes had been sent to the defendant with the name of the plaintiffs on them, they would, according to the cases, have been responsible. Le Feuvre v. Lloyd, reported in 1 Marsh. 318, and 5 Taunt. 749, is expressly in point. They have, by putting the notes in suit, placed their names upon them, and have disabled themselves from striking them off. They have taken upon themselves to collect the money by suit, and ought to show their inability to do so, before they can come against the defendant. The defendant has been prevented from exercising any power over these notes by compromise, or otherwise, by the acts and omissions of the plaintiffs. The plaintiffs have undertaken to collect the money by suit. Under these circumstances, I think, they cannot recover the amount of the notes in this action. Judgment must be entered for the lesser sum found by the jury.